## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHINNELLA COOPER, | ) | Case No. 3:18-cv-120 |
| | ) | |
| | ) | JUDGE KIM R. GIBSON |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHILDREN'S BEHAVIORAL HEALTH, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

### I.    Introduction

This case arises from Defendant Children's Behavioral Health, Inc.'s ("CBH" or "Children's") alleged racial discrimination and "regarded as" disability discrimination against Plaintiff Chinnella Cooper ("Cooper") in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disability Act ("ADA"), and the Pennsylvania Human Relations Act ("PHRA") while Cooper was employed by the Defendant.  Pending before the Court is Defendant's Motion for Summary Judgment.  (ECF No. 74).  Also pending before the Court is Defendant's Motion to Strike Plaintiff's Sham Affidavit. (ECF No. 99).    The Motions are fully briefed (ECF Nos. 75, 88, 99, 104) and ripe for disposition.  For the reasons that follow, Defendant's motion to strike portions of Plaintiff's affidavit is **DENIED**. Defendant's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

### II.    Jurisdiction and Venue

This Court has subject-matter jurisdiction because Plaintiff's Title VII claim and ADA claim arise under federal law. 28 U.S.C. § 1331. The Court has supplemental jurisdiction over Plaintiff's PHRA claims because those claims form part of the same case or controversy as her Title VII and ADA claims. 28 U.S.C. § 1367. Venue is proper because a substantial portion of the events giving rise to Plaintiff's claims occurred in the Western District of Pennsylvania. 28 U.S.C. § 1391.

III. **Factual Background**

The following facts are undisputed unless otherwise noted.[1]

A. **Introduction**

Ms. Chinnella Cooper, a black female, was hired as a full-time Therapeutic Staff Support ("TSS") employee at Children's in 1997. (ECF No. 1 at ¶ 10; ECF No. 78 at ¶ 1-2). As a TSS employee, Cooper's primary job responsibilities involved working with children, or "clients," between the ages of 2 and 21 who required additional care and attention in school, at home, and in the community due to behavioral and mental health disorders (*Id.* at ¶ 6). Cooper worked in Children's Mercer County District and was assigned to work at schools, clients' homes, and/or in the community within the district. (ECF No. 89 § I at ¶ 7). During "in-school" shifts, Cooper would attend class with clients in the classroom, and during "in-home and community" shifts, she would serve clients at their homes or in community spaces such as a library or park (ECF No.

---

[1] The Court derives these facts from a combination of Plaintiff's Complaint (ECF No. 1), Defendant's Concise Statement of Material Facts in Support of Defendant's Motion for Summary Judgment (ECF No. 78), Plaintiff's Responsive Concise Statement (ECF No. 89) and Defendant's Response to Plaintiff's Concise Statement of Additional Facts (ECF No. 97).

78 at ¶ 8).  Although Children's provided services in in-school settings, Children's did not control or manage the schools in which they provided services. (ECF No. 78 at ¶ 10).

TSS employees provide services to children based on each child's psychological evaluations, clinical needs, and treatment plan as determined by an Individual Service Plan Team Meeting ("ISPT"). (ECF No. 78 at ¶ 11-12).  Case managers act as coordinators between clients, parents, clinical staff, and TSS employees. (ECF No. 97 at ¶ 5).  Managing TSS employee schedules is one part of a case manager's job duties and many factors are considered by case managers when scheduling TSS services. (ECF No. 97 at ¶ 5).  These factors include: the schedule of the TSS employee, the TSS employee's employment status, the TSS employee's weekly hourly averages, the number of clients needing services, the geographic area where clients are located, the types of services clients need, client schedules, and several other factors. (ECF No. 97 at ¶ 5).  Despite Children's treatment plans and scheduling efforts, parents are free at any time to choose a different service provider if they are dissatisfied with Children's services. (ECF No. 78 at ¶ 15).

### B.  Cooper's Medical Diagnosis and Leave of Absence

In 1998, shortly after she began working for Children's, Cooper was diagnosed with tuberculosis and took a leave of absence from Children's for about six months. (ECF No. 78 at ¶ 21). After fully recovering, and producing a doctor's note confirming her full recovery, Cooper returned to work at Children's in 1998 or 1999 without any restrictions placed on her because of her previous tuberculosis diagnosis. (*Id.* at ¶ 22).

### C.  Cooper is Demoted from Full-time to Part-time

Following Cooper's return to work, she remained a full-time employee with Children's until January 14, 2010 when she received a memorandum from Gale Erdice (white), Assistant

Regional Director, changing her status from a full-time employee to a part-time employee. (ECF No. 76-7).   In that memorandum, Erdice told Cooper that her change in employment status was not due to any fault on the part of Cooper. (*Id.*).  Instead, Erdice told Cooper that Children's "d[id] not have any more client hours to give [her]" because Value Behavioral Health, the managed care organization, had been denying clients and reducing hours. (*Id.*). Because Children's provided fewer hours to Cooper, she began averaging fewer than 30 hours per week, her status changed from full-time to part-time, her hourly pay was reduced, and her benefits were terminated. (ECF No. 89 § II at ¶ 12).

### D.  Children's Employment Policy

Children's maintains two categories of TSS employees: full-time and part-time.  (ECF No. 89 § II at ¶ 9). Full-time TSS employees are assigned 30 hours or more per week and are entitled to benefits including medical, dental, vision and life insurance, as well as paid time off. (*Id.*). Part-time TSS employees are assigned less than 30 hours per week, compensated at a lower pay rate than full-time TSS employees, and are not entitled to receive benefits. (*Id.*).  TSS employees are required to submit "billable hours" which are composed of hours spent with clients in-school, at-home, or in the community as well as supervision meetings with the TSS employee's supervisor (*Id.* at ¶ 16). Children's employment policy states that a TSS employee is classified as a full-time employee if she maintains an average of 30 or more billable hours per week over an eight-week period. (ECF No. 78 at ¶ 17).  If a full-time TSS employee does not maintain the 30 hours or more per week average needed to maintain full-time status over an eight-week period, Children's asserts that the TSS employee is given a two-week follow-up period to re-attain the number of hours necessary to be full-time again. (*Id.* at ¶ 18).

Children's also states in its employment policy that it gives preference to full-time TSS employees to obtain new assignments if (i) the full-time employee needs more hours to maintain their full-time status and (ii) the new client's schedule does not conflict with the TSS employee's existing schedule. (*Id.* at ¶ 19). In addition to the policy outlined above, for a period of time Children's permitted TSS employees to switch back and forth between full-time and part-time status. (*Id.* at ¶ 20).

### E.  Cooper Experiences Cold Classrooms

Around the same time Cooper's employment status was changed from full-time to part-time in early 2010, Cooper perceived that some of the classrooms where she sat with her clients felt cold. (ECF No. 78 at ¶ 26). Teachers and students were also present in the classrooms at the time Cooper perceived the rooms as cold, and at some point, Cooper complained about the classroom temperature to a teacher. (*Id.* at ¶ 27). Cooper asked other teachers (who were not Children's employees) to make the classrooms warmer, but no adjustments were made because the rooms still felt cold and she and the students would occasionally don their coats if it got too cold. (*Id.* at ¶ 29). Based on her observations of the cold rooms she was in, Cooper assumed that the temperatures were turned down by someone in her classrooms because she had had tuberculosis and the cold air would "dampen" possible tuberculosis germs in the air. (*Id.* at ¶ 30, 37). Cooper supports this assumption with the facts that (i) when she arrived to classrooms in the winter months, schools would turn on their air conditioning, (ii) Children's knew she had been diagnosed with tuberculosis, and (iii) when Cooper returned to a cold classroom at the end of the day to retrieve an item, she perceived the heat had been turned on (ECF No. 89 § I at ¶ 30). Despite Cooper's theory and evidence, no one at the school had been told by Children's that

Cooper had had tuberculosis, and no one at Children's told Cooper they had informed the school of her tuberculosis diagnosis. (ECF No. 78 at ¶ 33-34).

### F.   Cooper Promoted from Part-time to Full-time

By fall of 2010, Cooper was still a part-time TSS employee (ECF No. 89 § II at ¶ 13). Around this time, Cooper submitted a questionnaire to Children's ethics committee complaining of both the cold classrooms and her low billable hours.[2] (*Id.* at ¶ 14).  Ten months after submitting the questionnaire to Children's management, Woznicki (white), a vice president with Children's, met with Cooper on August 23, 2011.  (ECF No. 89 § II at ¶ 14).  In that meeting, Cooper told Woznicki that she felt she was being passed over for hours, in part, due to a past medical issue. (ECF No. 78 at ¶ 41).  Following this meeting, in November 2011 Children's granted Cooper's request for more hours and changed her status from a part-time employee to a full-time employee (*Id.* at ¶ 44).

### G.   Cooper Experiences a Racist Remark from a Client's Grandmother

In 2011, a client's grandmother told Cooper that she "did not feel comfortable having black people come into [her] home" and that she "[doesn't] associate with niggers." (ECF No. 78 at ¶ 38).  After the grandmother made this comment, Cooper complained to her manager and she was no longer assigned to that client. (*Id.* at ¶ 39).  Although Cooper experienced this racist comment from the grandmother of this particular client, no one at Children's "ever made a racist comment" to or about Cooper while she was working at Children's. (ECF No. 78 at ¶ 104).

### H.   Cooper Loses a Client Comprising Most of Her Hours

---

[2] Neither Children's nor Cooper has a copy of this questionnaire. (ECF No. 97 at ¶ 13).

By late 2012 and into January 2013, Cooper was assigned two clients, one of which made up 80% of her billable hours. (ECF No. 89 at § II ¶ 22). In early 2013, the client who made up 80% of her client hours transferred to another agency. (*Id.* at ¶ 22). As a result, Cooper's weekly client hours dropped below 30 hours and she required additional case assignments to maintain an average of 30 hours or more per week to maintain her full-time status. (*Id.* at ¶ 23). For the next several weeks, Cooper's hours lagged well below the 30-hour requirement needed to remain a full-time TSS Employee.[3] (*Id.* at ¶ 25). By the end of the eight-week period following Cooper's client leaving, her weekly hourly average had dropped to 13.21 hours per week (*Id.* at ¶ 27).

During that same eight-week period of February 2, 2013 to March 23, 2013, there were five full-time TSS employees in the Mercer County District: Cooper (black); Fred Scriven (white); Debra Snyder (white); Megan Griffin (white); and Crystal Schuver (white). (*Id.* at ¶ 27). While Cooper's weekly hourly average fell to 13.21 hours during the eight-week period, the four other TSS employees, all of which were white, maintained weekly averages exceeding 30 hours per week.[4] (*Id.*). In addition to having less hours than the other full-time TSS employees, by the end of the eight-week period, Cooper also averaged less hours than many part-time TSS employees.[5] (*Id.* at ¶ 28-29).

---

[3] After Cooper's client left, Cooper was assigned the following weekly hours: week ending February 16, 2013: 8.5 hours; week ending February 23, 2013: 9 hours; week ending March 2, 2013: 6 hours; week ending March 9, 2013: 9 hours; week ending March 16, 2013: 9 hours; week ending March 23, 2013: 10 hours. (ECF No. 89 § II at ¶ 25).

[4] The full-time TSS employee weekly hourly averages during this time period were: Fred Scriven: 38.43 hours; Megan Griffin: 36.00 hours; Debra Snyder: 34.64 hours; Crystal Schuver: 44.43 hours. (ECF No. 89 § II at ¶ 27).

[5] During the week ending March 23, 2013, Cooper was assigned 13 billable hours, part-time TSS employee Julie Babich (white) was assigned 15 hours, part-time TSS employee Pam Brown (white) was assigned 16.5 hours, and part-time TSS employee Stephanie Thornton (black) was assigned 33 hours. (ECF No. 89 § II at ¶ 29).

### I.   Cooper is Demoted to Part-time

Children's maintains that it regularly monitored the workload and utilization of its TSS employees with weekly reports which the case managers would email to regional directors and/or the vice president, Woznicki. (ECF No. 78 at ¶ 58).  Ryan Hills (white), Cooper's new case manager, tracked the workload of TSS employees in the Mercer County District and emailed reports to the regional director, Pat Rossi. (*Id.* at ¶ 59).  On February 14, 2013, after emailing a time report, Hills was told by Rossi, to "get Chinella [sic] up." (ECF No. 76-16).  On February 21, 2013, Rossi responded to another of Hills' time reports by informing Woznicki and Hills that Rossi would, "be working with Ryan on Chinnella Cooper." (ECF No. 76-17).   A week later, Hills emailed Rossi and Woznicki informing them that "FT TSS Chinella Cooper will sub and get hours when available." (ECF No. 90-13).  Woznicki responded to Hills' email asking if Hills was waiting for a new case to come in, if he had attempted to contact other families to see if they wanted new staff, and asking why Schuver was working 50 hours (over-time) and Thornton (black), a part-time TSS employee, had 33 hours. (*Id.*).

On March 5, 2013, after Cooper's hours continued to lag below other full-time TSS employees, Hills informed Rossi again that "TSS Chinella Cooper will sub and get hours when they become available." (ECF No. 76-18).  Rossi responded to Woznicki and Hills stating that they had discussed Cooper and that Hills was to call the parents of clients assigned to part-time TSS employees to see if they would agree to a TSS employee change. (ECF No. 76-18).   Rossi stated that Hills would document each call he made and the parents' responses. (*Id.*).

In an email from Woznicki to Rossi and Hills dated April 1, 2013, Woznicki stated that, "Cooper was not going to have enough hours [to maintain her 30-hour required average to

remain full-time]," and that Cooper was on a "2 week follow-up." (ECF No. 91-2 at 2). In that same email, Woznicki conceded that "Chinella [was] never going to make the 2 week follow-up," and that Hills had previously told her that he "'forgot' to contact parents to re-assign others." (ECF No. 91-2). Woznicki concluded her email saying that Children's would "need to make [Cooper] PT but [she] want[ed] to ensure [Hills] did everything [he] needed to do for [Cooper] before that happen[ed]." (ECF No. 91-2).

Less than two hours later, Hills sent an email to Woznicki with a phone log for the clients assigned to part-time TSS employees. (ECF No. 91-3). In that email, Hills stated that Mercer County is what he called "an old county" where TSS employees have been working with the same clients for years and that parents don't "like change in general" but "when they do due to a conflict with a staff, they let [him] know." (*Id.*). In Hills' call logs, he reported that all but two part-time TSS clients had scheduling conflicts with Cooper's schedule and that the two clients who did not have a conflict had had the same TSS employee for a while—inferring they wanted to keep the same TSS employee. (ECF No. 91-3 at 3). Hills asserted that the responses from these clients, as well as the difficulty of scheduling with clients who are discharging, titrating, or transferring, made it difficult to get more hours for full-time TSS employees—including Cooper. (*Id.*).

Cooper alleges that despite Children's having a policy of giving preference to full-time TSS employees to receive client hours to maintain their full-time employment status, throughout this time period Children's assigned white clients to three white part-time employees while she,

a black full-time TSS employee, received none.[6] (ECF No. 89 § II at ¶ 28).  A few weeks later, on May 8, 2013, because Cooper's weekly hourly averages dropped below 30 hours per week, Children's changed Cooper's status to part-time, reduced her hourly pay rate and terminated her benefits. (ECF No. 90-17).

### J.   Cooper Accuses Children's of Racially Discriminatory Client-Assigning Practices

Cooper alleges several racially discriminatory client-assigning practices during the period in which she was demoted and in the months and years thereafter.  First, Cooper alleges that Children's did not demote Debra Snyder (white), a full-time TSS employee, to part-time when she averaged less than the required 30-hour averages for two eight-week periods around the time Children's demoted her. (ECF No. 80 § II at ¶ 37).

Additionally, following Cooper's transition from full-time to part-time, Cooper repeatedly, verbally, asked Hills for more cases and hours; (ECF No. 90-4 at ¶ 13, 15); however, Hills repeatedly failed to assign her more hours. (ECF No. 89 § II at ¶ 39).  Cooper alleges that in the time period following her demotion, and up until she resigned from Children's, clients that could have been offered to Cooper to regain her 30-hour average were assigned to both white full-time and white part-time TSS employees over Cooper. (ECF No. 89 § II ¶ 39).  Specifically, Cooper alleges that (i) in June 2013, a white client previously assigned to Nicole Fisher (white), who had recently resigned, was reassigned to Megan Griffin (white) over her; (ii) in August 2013,

---

[6] During the relevant time period, part-time TSS employee Julie Babich (white) was assigned C.S. (white) for 15 hours per week, part-time TSS employee Kathleen Walters (white) was assigned R.D. (white) and A.F. (white) for 14-16 hours per week, and part-time TSS employee Pam Brown (white) was assigned C.W. (white) for 12-16 hours per week. (ECF No. 89 § II at ¶ 28).  Children's maintains these clients were not assigned to Cooper due to scheduling conflicts. (ECF No. 97 at ¶ 28).

a white client previously assigned to Kathleen Walter (white), who had recently resigned, was assigned to Fred Scriven (white); (iii) in August 2013, a white client was reassigned to Stacy McIntire (white); (iv) in September 2013, Hills assigned a white client to Scriven giving him a total of 43.5 hours per week in October 2013 while Cooper maintained only one client; (v) in December 2013, Hills assigned a client from the Mercer County District (Cooper's area) to Kristy Vilkie (white) in Crawford County; (vi) in December 2013, Hills assigned a white client to Crystal Schuver (white) for 8 hours a week; (vii) in August 2014 Hills assigned two white clients to part-time TSS worker Kara McGonigal (white) who had just begun at Children's that month; and (viii) in November 2014, Hills assigned one of Kara McGonigal's white clients to a newly hired part-time TSS worker Mary Miller (white) for ten hours per week.[7] (*Id.*). According to Cooper, a similar pattern of assigning clients to white part-time and full-time TSS employees continued in 2015, 2016, and 2017. (*Id.* at 46).

Cooper further alleges that Children's had an apparent practice of assigning the majority of black clients to black TSS workers and the majority of white clients to white TSS workers. (ECF No. 89 § II ¶ 40).

Lastly, Cooper alleges that while she was a part-time TSS employee, Hills assigned clients to a white part-time TSS employee, Kara McGonigal, giving her enough average hours in an eight-week period to be promoted to full-time from part-time in December 2014 while Cooper remained a part-time TSS during the same time frame. (ECF No. 89§ I ¶ 71). Further, Cooper asserts that even when she achieved the 30-hour weekly average over an eight-week period, Children's did

---

[7] Children's denies Cooper's characterizations of these client assignments and asserts Cooper's own schedule prevented her from taking on these clients. (ECF No. 97 at ¶39).

not promote her to full-time status like they had promoted Kara McGonigal. (ECF No. 89§ II ¶ 41).

### K. Cooper Files Complaints with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Rights Commission ("PHRC")

Cooper filed her Charge of Discrimination with the EEOC and PHRC on July 22, 2016. (ECF No. 78 at ¶ 110), and on March 18, 2018, the EEOC issued Cooper her right to sue letter (ECF No. 78 at ¶111).

### L. Termination of Children's Back-and-Forth Policy and Implementation of Written Requests for Hours

In March 2017, Woznicki sent an email to Children's employees informing them that employees who lost full-time status for failing to make the 30 hour per week average could no longer transition back to full-time status from part-time status.[8] (ECF No. 90-19). This policy was officially formalized by Children's on September 15, 2017. (ECF No. 90-20). Notably, two changes were made between the policy referenced in Woznicki's initial email and the formalized policy of September 15, 2017, namely (i) if an employee became part-time for failure to make the 30-hour required average, that employee was not allowed to transition to full-time again for a period of two years, and (ii) if a full-time employee chose to transition to part-time for reasons outside of the required averages, they could transition to full-time again if the hours were available to them. (*Id.*). In that same email, Children's informed its employees of a new form they were to fill out if they were interested in taking on more client hours. (*Id.*).

---

[8] The parties dispute when the policy preventing TSS employees from going back and forth between part-time and full-time status was in effect. Children's alleges that the policy existed prior to April 2012. (ECF No. 78 at ¶ 20). Cooper alleges that the policy did not exist until she was notified by email in March 2017 and the policy was formalized in September 2017. (ECF No. 89 § I at ¶ 20).

**M. Cooper Complies with Children's Policy to Request Hours in Writing**

On October 17, 2017, upon learning of Children's new policy requiring written requests for hours, Cooper submitted a form to her case manager, Hills. (ECF No. 89 § II at ¶ 62).  At the time, Cooper had a client approved for 27.5 hours per week, leaving her 2.5 hours shy of the 30-hour threshold. (*Id.* at ¶ 62).  Two days later, Hills denied Cooper's request stating she would get hours if they became available and fit her current client schedule (ECF No. 90-27). Following Hills' denial, Cooper claims Hills assigned three white clients to other white TSS coworkers during September, October, November and December 2017—any of which would have made her reach 30 hours if she was assigned the client work. (ECF No. 89 § II at ¶ 64).  On March 28, 2018, after nearly five years working as a part-time TSS employee, Cooper emailed Hills to inform him that she would be resigning from Children's in two weeks. (ECF No. 76-38).  Cooper formally left Children's on April 11, 2018 (*Id.*).

## IV.     Procedural Background

On June 6, 2018, Cooper filed her Complaint. (ECF No. 1).  Children's answered Cooper's Complaint on October 10, 2018.  (ECF No. 10).  Children's moved for summary judgment on February 22, 2021.  (ECF No. 74).  Cooper responded in opposition on April 2, 2021 (ECF No. 88) to which Defendant replied on April 23, 2021.  (ECF No. 98).  On April 23, 2021, Children's filed a Motion to Strike Plaintiff's Sham Affidavit (ECF No. 99).  Cooper responded in opposition on May 3, 2021.  (ECF No. 104).

## V.      Legal Standard

This Court will grant summary judgment "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010) (quoting *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). There is a genuine issue of fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248. The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine if the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). In deciding a summary judgment motion, this Court "'must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n.11 (1986)). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993); *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594

(3d Cir. 2005) (noting that a party opposing summary judgment "must present more than just

bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue").

## VI.    Discussion

Cooper asserts claims of racial discrimination[9] and "regarded as" disability discrimination

against Children's.  The Court will first address Defendant's Motion to Strike Plaintiff's Sham

Affidavit (ECF No. 99) before turning to each claim in turn.

### A.  Children's Motion to Strike Portions of Cooper's "Sham Affidavit"

Under the sham affidavit doctrine, "a court will disregard an affidavit that is inconsistent

with an affiant's prior deposition testimony ... unless the party relying on the affidavit in

opposition to the motion can present a legitimate reason for the discrepancies between the

deposition and the affidavit." *Smith v. Johnson and Johnson*, 593 F.3d 280, 285 n. 3 (3d Cir.2010); *see

also Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806–07, 119 S.Ct. 1597, 143 L.Ed.2d 966

(1999) ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment

simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit

that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction

or attempting to resolve the disparity."); *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 251 (3d

Cir. 2007) ("[A] party may not create a material issue of fact to defeat summary judgment by filing

an affidavit disputing his or her own sworn testimony without demonstrating a plausible

explanation for the conflict.") (internal quotations omitted).

---

[9] Plaintiff asserts these claims under both Title VII and the PHRA.  Courts analyze claims under both
statutes in the same manner.  *See Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318 (3d Cir. 2000).  The
Court references only the Title VII framework for brevity—if Defendant is entitled to summary judgment
on Plaintiff's Title VII claims, it is likewise entitled to summary judgment on Plaintiff's PHRA claims.

The Third Circuit has adopted a "flexible approach" in applying the sham affidavit doctrine. *Jiminez*, 503 F.3d at 254. Specifically, if independent evidence in the record bolsters an otherwise questionable affidavit, courts within the Third Circuit will generally not disregard the affidavit. *Id.* (citing *Baer v. Chase*, 392 F.3d 609, 624–25 (3d Cir.2004)). The corroborating evidence may establish that the affiant was mistaken, confused, or did not possess all of the facts during the previous deposition. *Id.*   Moreover, statements made in an affidavit that may be more properly characterized as "gaps or minor discrepancies," do not have the qualities of a patently sham affidavit. *See, e.g., Healey v. EchoStar Satellite L.L.C.*, 2009 WL 1457733, at *1 (W.D.Pa. May 22, 2009) (finding that "while Plaintiff's deposition testimony and affidavit might appear at odds, they can be construed together; her affidavit does not have the qualities of a patently sham affidavit. The issues to which Defendant points are more properly characterized as gaps or minor discrepancies in Plaintiff's testimony, which bear on her credibility and are matters properly reserved for cross-examination").   However, "[w]hen a party does not explain the contradiction between a subsequent affidavit and a prior deposition, it is appropriate for the district court to disregard the subsequent affidavit and the alleged factual issue in dispute as a 'sham,' therefore not creating an impediment to a grant of summary judgment based on the deposition." *Jiminez*, 503 F.3d at 254.

Children's argues that paragraphs 10, 12, 15, and 18 of Cooper's affidavit must be stricken because they contradict her prior testimony. (ECF No. 99 at 2-5).

### 1. Paragraph 10 of Cooper's Affidavit

In paragraph 10 of her affidavit, Cooper states that, "In May 2013, I went from full-time to part-time after my Case Manager, Ryan Hills, failed to assign me another case, or cases, so that

I would have enough hours per week to remain full-time." (ECF No. 90-4 at ¶ 10). Children's argues that paragraph 10 contradicts Cooper's prior sworn testimony because in her deposition Cooper admitted that (1) she lost 80% of her client hours at once, and (2) losing her client was not due to any sort of discrimination against her by Children's. (ECF No. 99 at 4). Additionally, Children's contends that when confronted with records showing Hills had attempted to keep Cooper at full-time status by replacing her lost hours, she testified she was not aware of his efforts until the day of her deposition. (*Id.* at 5). In response, Cooper concedes that she lost 80% of her client hours at once; however, that concession does not render her deposition inconsistent with paragraph 10 of her affidavit. (ECF No. 104 at 6). Cooper argues that when she lost hours from her main client, she was unable to make up those hours because Hills failed to assign her a case or cases that would have allowed her to make up the hours she lost. (*Id.* at 7).

Having reviewed Cooper's testimony, the Court finds that there is no contradiction between paragraph 10 of Cooper's affidavit and her prior testimony. Cooper has not alleged that the loss of her client comprising 80% of her hours was due to discrimination (ECF No. 89 § I at ¶ 70). Cooper consistently alleges that she lost a client who made up 80% of her hours in early 2013, and that by May 2013 she was unable to recoup the time necessary to remain a full-time TSS employee because Hills failed to assign her a replacement client or clients to make up for the hours lost when her client left. Furthermore, Hills' efforts to assign clients to replace Cooper's lost hours are not at issue, but whether he actually assigned Cooper enough hours to remain a full-time TSS employee. Nothing in paragraph 10 of Cooper's affidavit contradicts her deposition testimony. The Court denies Children's request to strike paragraph 10 from Cooper's affidavit.

### 2.  Paragraph 12 of Cooper's Affidavit

In paragraph 12 of her affidavit, Cooper states that, "Between 2013 and 2016, my mother was ill, but that did not affect my ability to work.  My family (including my brother) and I hired and paid home health aides to care for my mother when I was working.  Then, in approximately 2015, my niece moved in with my mom and cared for her until my mother passed.  Even though my mother was sick, I asked my Case Manager for more cases/hours because I wanted to work, and would have worked, a full-time schedule.  Nonetheless, CBH did not assign me enough hours to return to full-time status."  (ECF No. 90-4 at ¶ 12).  Children's contends that Cooper's affidavit contradicts her deposition testimony because when Cooper was confronted with a May 22, 2014 email in her deposition (ECF No. 76-26), Cooper agreed she was unable to take a new assignment "because [she] had to care for her mother."  (ECF No. 99 at 2).  Children's further contends that, according to a schedule Excel spreadsheet maintained by Children's during the relevant time period, Cooper could not work several times in 2015 due to her mother's illness (*Id.*).  According to Children's, both Cooper's prior testimony and their schedule records directly contradict her affidavit that her mother's illness did not affect her ability to work.  (*Id.*).

Cooper responds by pointing to another section of her deposition where Cooper denied not being able to work and stating she specifically hired nurses so she could work.  (ECF No. 99-1 at 186-187).  Cooper further contends that when questioned about the email referenced by Children's (ECF No. 76-26), Cooper only suggested that "maybe," at this "one particular time" she could not come in because she did not have care for her mother.  (ECF No. 99-1 at 186-187).  Lastly, Cooper argues that Hills' comments in the schedule Excel spreadsheet maintained by

Children's during the relevant time period are not sworn statements made by Cooper that should serve as a basis for striking her affidavit. (*Id.* at 4).

The Court finds that Cooper's statements do not have the qualities of patently sham averments. Cooper stated in her deposition that she hired nurses to assist with her mother and got help from her niece so she could work. (ECF No. 99-1 at 186-187). Additionally, when confronted with the email referenced by Children's during her deposition (ECF No 76-26), Cooper disagreed with Children's that the email suggested she could not work because she did not want to hire a nurse. (ECF No. 99-1 at 186-188). When pressed more by Children's to explain the email, Cooper only conceded that on this one particular occasion she could not take an assignment because she had to care for her mother. (*Id.* at 188-189). A one-time concession of unavailability to work over a three-year period is more properly understood as a minor gap or inconsistency from Cooper's affidavit rather than a patently sham averment. Moreover, the Court finds that the schedule Excel spreadsheet records kept by Children's, which are not sworn statements previously made by Cooper, are not a basis for striking paragraph 12 of Cooper's affidavit. The Court denies Children's request to strike paragraph 12 from Cooper's affidavit.

### 3. Paragraph 15 of Cooper's Affidavit

In paragraph 15 of Cooper's affidavit she states, "Prior to October 2017, I typically verbally asked Ryan Hills for more cases and hours, including *in person* at the Mercer County District office prior to, or after, the weekly meetings with the Case Supervisors, and also via telephone." (ECF No. 90-4 at ¶ 15) (emphasis included). Children's argues that this declaration contradicts Cooper's previous sworn testimony because when Children's confronted Cooper with an email from Hills stating that "we do not see you hardly at all" during her deposition (ECF No 76-37), Cooper stated

that Hills did not see her but she would go to the office to turn in her paperwork. (ECF No. 99 at

4).   Cooper responds that her affidavit is not inconsistent with her deposition because (i) Hills'

email saying he never saw Cooper was not a sworn statement made by Cooper, (ii) the question

asked in Cooper's deposition inquired about "this point in time" and was not about general

behavior, and (iii) that the "point in time" inquired about was March 2018—six months after

Children's revised its policy and began having TSS employees submit written forms to request

hours. (ECF No. 104 at 4-6).

Having reviewed Cooper's testimony, the Court finds that there is no contradiction

between paragraph 15 of Cooper's affidavit and her prior testimony.   The question posed to

Cooper in her deposition asked if Cooper "agree[d] with [Hills] that [she] didn't come into the

office at this point in time." (ECF No. 99-1 at 232).   Cooper stated her disagreement with that

statement in her deposition.   (*Id.*).   Additionally, the point in time being referenced in the

deposition corresponds to the email Cooper received from Hills dated March 21, 2018. (ECF No.

76-37).   Cooper's affidavit states that she would typically verbally ask Hills for more cases and

hours *prior to* October 2017. (ECF No. 90-4 at ¶ 15).   It is possible that Cooper verbally asked for

more cases and hours prior to October 2017 and that by March 21, 2018 Cooper either did not

come to the office as alleged by Hills, or he simply did not see her.   The Court finds there is no

contradiction between Cooper's deposition testimony and her affidavit.   The Court denies

Children's request to strike paragraph 15 from Cooper's affidavit.

### 4.  Paragraph 18 of Cooper's Affidavit

In paragraph 18 of Cooper's affidavit she states, "Neither Ryan Hills, nor anyone else at

CBH, ever discussed assigning me a client who was approved for more than 40 hours per week

in December 2013 (or at any other time for that matter).  I never told Ryan Hills that I was

unwilling to cover both in-school and home and community hours for a client in December 2013.

In fact, I never told Ryan Hills, at any time, that I was unwilling to cover both in-school and home

and community hours for any client who was approved for 40 or more, or even 30 or more, hours

per week." (ECF No. 90-4 at ¶ 18).  Children's argues this declaration is inconsistent with Cooper's

prior sworn testimony because when Cooper was asked about a client she was offered in

December 2013, she testified she could not recall having a client by that name. (ECF No. 99 at 5).

But now, Cooper clearly remembers in her affidavit what she did not tell her case manager during

that same time period. (ECF No. 99 at 5).  In response, Cooper contends that her testifying she did

not know who a client was in December 2013 is not the same as remembering never telling Hills

that she was unwilling to cover clients in-school and in home and community who were

approved for 30 or 40 hours or more per week in her affidavit. (ECF No. 104 at 8).

The Court finds that paragraph 18 of Cooper's affidavit does not have the qualities of a

patently sham statement.  Cooper's failure to remember a specific client during her deposition

yet remembering what she never told her case manager in the same period in her affidavit is more

appropriately labeled a minor gap or inconsistency.  This minor gap or inconsistency will bear on

the credibility of Cooper's memory during cross-examination but does not rise to the level of a

sham averment.  The Court denies Children's request to strike paragraph 18 from Cooper's

affidavit.

### B. Cooper Can Show that Defendant Discriminated Against Her Because of Her Race

Cooper asserts that she was subject to discrimination because of her race.  Title VII makes

it unlawful for an employer to discriminate against an individual with respect to their

employment on the basis of the individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). It is undisputed that during the period of time relevant to this case, Defendant was an "employer" subject to Title VII's provisions, and Cooper was an "employee" entitled to statutory protection from race-based discrimination. § 2000e(b), (f).

Since this is an employment discrimination case in which Cooper has presented no "direct evidence" of discrimination, the Supreme Court's framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), provide the formulation for allocating the requisite burdens of proof and production for purposes of the instant motion for summary judgment.[10] In an employment discrimination case of this kind, the plaintiff must first establish a prima facie case of illegal discrimination. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff establishes a prima facie case of discrimination, the defendant must articulate legitimate, non-discriminatory reasons for treating the plaintiff in an adverse manner. *Id.* at 802–03. If the defendant articulates legitimate, non-discriminatory reasons for the plaintiff's adverse treatment, the plaintiff must demonstrate that the reasons given by the defendant for such treatment are merely a pretext for unlawful employment discrimination. *Id.* at 804–05.

### 1. The Parties' Arguments

---

[10] The *McDonnell Douglas-Burdine* burden-shifting framework does not apply in an employment discrimination case in which a plaintiff presents "direct evidence" of discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). "Direct evidence" of discrimination is evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any presumption" from the plaintiff's prima facie case to shift the applicable burden of production to the defendant. *Starceski v. Westinghouse Electric Corp.*, 54 F.3d 1089, 1096 n.4 (3d Cir. 1995). The evidence presented in this case does not constitute "direct evidence" of discrimination.

Children's asserts that Cooper's Title VII claims are time-barred.  (ECF No. 75 at 5-6). Under Pennsylvania and federal law, discrimination charges must be brought within 300 days of the unlawful employment practice. (*Id.*).  Cooper filed charges with the EEOC and PHRC on July 22, 2016. (*Id.*).  Therefore, any alleged discriminatory conduct for which Cooper seeks relief must have occurred on or after September 26, 2015. (*Id.*).   Children's argues that all alleged discriminatory conduct happened well before September 26, 2015, and that the latest alleged adverse employment action occurred in May 2013, more than two years outside the limitation period. (*Id.*).

Children's also contends that Cooper cannot establish a prima facie claim of race discrimination because she cannot establish (i) that she suffered an adverse employment action, and (ii) that the adverse employment action occurred under circumstances that support an inference of racial discrimination. (*Id.* at 6-8).  Cooper cannot establish that she suffered an adverse employment action because (a) she transitioned from full-time to part-time status due to a client leaving the agency who comprised 80% of her billable hours, and (b) Cooper's resignation was voluntarily. (*Id.*).   Additionally, Cooper cannot establish circumstances supporting an inference of racial discrimination because (a) Cooper became a part-time employee because her client's parents switched agencies and that client switch was not the result of discrimination, (b) an "office rumor," which Cooper cannot recall the details of, forms the basis of her allegation that a white TSS employee was paid significantly more than her, and (c) Cooper cannot substantiate her claim that other black employees experienced race discrimination at the hands of their supervisor. (*Id.*).

Children's further asserts that even if Cooper can establish a prima facie case of discrimination, Children's can show that it transitioned Cooper from full-time employment to part-time employment and maintained Cooper as a part-time employee for a legitimate, non-discriminatory reason. (*Id.* at 7-11).   Cooper lost her full-time employment status as a TSS employee in May 2013 when her client left Children's for a competing agency, and Cooper cannot show that this non-discriminatory reason for transitioning Cooper from full-time to part-time is pretextual.  (*Id.*).   Children's contends that Cooper has no evidence showing that her race was more likely than not the motivating or determining cause of Children's decision to transition Cooper from full-time to part-time employment status. (*Id.*).

Cooper responds that Children's discriminated against her because she is black. (ECF No. 88 at 1).  First, Cooper asserts that her claims against Children's are timely under the "continuing violations doctrine" because she experienced ongoing and continuous disparities in work assignments, failures to promote, and compensation before and after September 26, 2015. (*Id.* at 2-5).   Next, Cooper contends that she can establish a prima facie case of race discrimination because (i) she experienced an adverse employment action and (ii) the adverse employment action occurred under circumstances that support an inference of racial discrimination. (*Id.* at 6-11).   Cooper experienced an adverse employment action because (a) Children's repeatedly failed to assign her enough hours to return to full-time employment status and earn more money, and (b) she was constructively discharged from her position at Children's in 2018. (*Id.* at 6-8).   Cooper argues she can establish circumstances supporting an inference of racial discrimination because there are several instances where Children's repeatedly passed Cooper over for hours that would have returned her to full-time status and assigned those hours to white TSS employees. (*Id.* at 9-

11). Cooper can also demonstrate that the legitimate, non-discriminatory reasons articulated by Children's are merely pretextual because there are  numerous questions and credibility issues surrounding Cooper's transition from full-time to part-time and her constructive discharge for a jury to decide—including whether Cooper's race played any role in Children's decision to demote Cooper, fail to promote, and create circumstances necessitating her constructive discharge.  (*Id.* at 14).   Additionally, Children's disparate treatment of black and white employees can show that race played a role in Children's decision to demote, fail to promote, and constructively discharge Cooper. (*Id.*).

### 2. Cooper's Discrimination Claim of Failure to Promote is Timely Under the Continuing Violations Doctrine

To bring suit under Title VII, a plaintiff in a deferral state, like Pennsylvania, must file a complaint with the EEOC within 300 days of the alleged unlawful employment practice. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157,165 (3d Cir. 2013); 42 U.S.C. § 2000e–5(e)(1).  However, "if the alleged discriminatory conduct is a 'continuing violation,' the statute of limitations begins to run on the date of the last occurrence of discrimination." *Miller v. Beneficial Management Corp.*, 977 F.2d 834, 842 (3d Cir. 1992).   The "continuing violations doctrine, serves as an 'equitable exception to the timely filing requirement,'" which is "most frequently applied in employment discrimination claims." *Cowell v. Palmer Tp.*, 263 F.3d 286, 292 (3d Cir. 2001).

In applying the continuing violations doctrine in employment discrimination cases, the Supreme Court has distinguished between "discrete discriminatory acts" such as "termination, failure to promote, denial of transfer, or refusal to hire" and "hostile environment claims." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110-121 (2002).  The Court has found that

"hostile environment claims" are subject to the continuing violations doctrine because by "their very nature [hostile environment claims] involve repeated conduct." *Id.* at 115-121.   Conversely, the Court has held that the continuing violations doctrine does not apply to "discrete discriminatory acts" because each unlawful employment practice is a separate actionable unlawful employment practice. *Id.* at 114-115.

Notwithstanding the Supreme Court's holding in *Morgan,* the Third Circuit has long-distinguished between the discrete discriminatory act of failing to promote for "a specific vacancy" and failing to promote when a plaintiff could have been promoted "at any time." *Miller v. Beneficial Management Corp.*, 977 F.2d 834, 844 (3d Cir. 1992).  The Third Circuit has found that when a plaintiff "could have been promoted at any time," and the promotion is "not based on specific vacancies," the repeated failure to promote "constitutes a continuing violation." *Id.* (quoting *EEOC v. Hay Associates*, 545 F.Supp. 1064, 1082-183 (E.D.Pa. 1982).

Here, Cooper is alleging that two discriminatory employment practices should fall within the continuing violations doctrine (i) Children's discriminatory demotion of Cooper in May 2013 by failing to assign her enough client hours to remain full-time following her client discharge, and (ii) Children's ongoing discriminatory failure to promote Cooper by failing to assign her enough client hours to reach a 30-hour weekly average over several eight-week periods. The Court finds that the continuing violations doctrine does not apply to Cooper's discriminatory demotion claim but does apply to Cooper's discriminatory failure to promote claim.  Cooper's initial demotion from full-time to part-time falls squarely within the Supreme Court's definition of a "discrete discriminatory act" because it was a one-time demotion forming a separate actionable unlawful employment practice. *Morgan*, 536 at 114-115. Because Cooper filed her

EEOC and PHRC complaints on July 22, 2016, the statute of limitations allows Cooper to bring claims for discriminatory conduct which occurred on or after September 26, 2015.  Cooper's demotion from full-time to part-time occurred on May 8, 2013—more than two years before September 26, 2015.  The continuing violations doctrine does not apply to Cooper's claim for discriminatory demotion and she is time-barred from bringing a claim against Children's for her demotion from full-time to part-time.

Nevertheless, Cooper's claims for failure to promote are timely under the continuing violations doctrine. Under the continuing violations doctrine, "the statute of limitations begins to run on the date of the last occurrence of discrimination, rather than the first." *Miller v. Beneficial Management Corp.*, 977 F.2d 834, 842 (3d Cir. 1992).  Children's had a policy that permitted TSS employees to switch back and forth between full-time and part-time status until a policy was emailed to staff in March 2017 and memorialized in September 2017 ending the back-and-forth policy. (ECF No. 89 § I at ¶ 20).  Cooper's claims of race discrimination for failure to promote are not time-barred because Cooper could have been promoted back to full-time, had her pay increased, and had her benefits restored every eight to ten weeks from the time of her demotion in May 2013 to the memorialization of employment policy in September 2017.  Because Cooper could have been promoted at any time, and her promotion was not based on specific vacancies at Children's, Children's repeated failure to promote Cooper following her demotion constitute continuing violations.  The Court finds Cooper's claims of race discrimination in Children's failure to promote are timely under the continuing violations doctrine.

### 3.  Cooper Can Establish a Prima Facie Case of Race Discrimination

To establish a prima facie case of discrimination, the plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) that the adverse employment action occurred under circumstances that give rise to an inference of unlawful discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d. Cir. 2008).[11]

Here, it is undisputed that (1) Cooper is a member of a protected class because she is black (ECF No. 78 ¶ 1), and (2) that she was qualified for the position she held (ECF No. 78 ¶ 57; ECF No. 89 § I ¶ 57; ECF No. 89 § II at ¶ 7; ECF No. 97 at ¶ 7). Therefore, the Court must only determine whether (i) Cooper experienced an adverse work event and (ii) whether Cooper has shown that Children's actions give rise to an inference of unlawful discrimination.

### i. Cooper Suffered an Adverse Employment Action

Cooper alleges two adverse employment actions,[12] (i) failure to promote and (ii) constructive discharge. An adverse employment action is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones v. Southeastern Pa. Transp. Authority*, 796 F.3d 323, 326 (3d Cir. 2015) (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir.2004) (internal quotation marks

---

[11] The Court has determined that these four elements are the ones relevant to the present case. *See Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1999) (noting that the specific elements of a prima facie discrimination case generally "depend on the facts of the particular case" before the court and "cannot be established on a one-size-fits-all basis."); *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977) ("The importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act.")

[12] Cooper's allegation of discriminatory demotion is time-barred under 42 U.S.C. § 2000e–5(e)(1). *See supra* Section VI.B.2.

omitted)). An "adverse or 'tangible' employment action is 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Brown v. Railroad Group Limited Liability Company*, 350 F.Supp.3d 300, 304 (3d Cir. 2018) (quoting *Barnett v. New Jersey Transit Corp.*, 573 Fed.Appx. 239, 244 (3d Cir. 2014)). *See also Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

Cooper's failure to promote claim falls squarely within the definition of an adverse employment action. Under Children's employment policy, full-time TSS employees are compensated at a higher rate, are entitled to benefits including medical, dental, vision and life insurance, and receive paid time off. (ECF No. 89 § II at ¶ 9). Part-time employees are paid a lower salary, are not entitled to benefits, and do not receive paid time off. (*Id.*). As a part-time employee, it is undisputed that Cooper was compensated less, received no benefits, and received no paid time off. Every eight to ten weeks that Children's failed to promote Cooper to full-time status she was denied higher compensation, insurance benefits, and paid time off. Children's failure to promote Cooper was an adverse employment action because her compensation, terms of employment, and privileges of employment were affected by Children's alleged ongoing discriminatory failure to promote. *Jones v. Southeastern Pa. Transp. Authority*, 796 F.3d 323, 326 (3d Cir. 2015). Children's ongoing and repeated failure to promote Cooper to full-time employment constitute an adverse employment action as required to establish a prima facie claim of race discrimination.

Turning to Cooper's constructive discharge claim, the Third Circuit has adopted the "reasonable person test" when determining whether an employee has been constructively

discharged. *Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 887-888 (3d. Cir. 1984). The reasonable person test requires the court to find whether acts of discrimination against an employee can make working conditions so "intolerable that a reasonable employee would be forced to resign." *Id.* The court need not find any "specific intent" on the part of the employer to cause the employee's discharge, the court need only "find that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Id.* Although Cooper experienced alleged discrimination with respect to her failure to promote claims, she continued to work for Children's for nearly five years following her May 2013 demotion. Cooper has not asserted any facts that indicate the discrimination she experienced at Children's was so intolerable that a reasonable person in her position would have resigned. Cooper's claim that she was constructively discharged by Children's fails as a matter of law.

### ii.  Cooper has Established an Inference of Racial Discrimination

At the prima facie stage, the "central focus" is on whether an employer has treated an employee less favorably than others on the basis of an illicit discriminatory criterion. *Howard v. Blalock Elec. Serv., Inc.*, 742 F. Supp. 2d 681, 701–02 (W.D. Pa. 2010). However, an inference of race-based discrimination cannot arise simply from an employee's subjective belief that her race somehow influenced the challenged employment action. *Id.* at 702. Instead, a plaintiff can establish a prima facie case of illegal discrimination by showing that she has received less favorable treatment than similarly situated employees who did not share her protected trait, *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352–57 (3d Cir 1999), or by showing that her race, color, or national origin was a "motivating factor" in the challenged employment action. *Gross v.*

*FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) (citing 42 U.S.C. § 2000e-2(m)).  Similarly situated, comparator employees must be similarly situated in "all relevant respects." *Wilcher v. Postmaster Gen.*, 441 F. App'x. 879, 881–82 (3d Cir. 2011).  This is a fact-intensive inquiry to be determined on a case-by-case basis. *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 305 (3d Cir. 2004).

Here, Cooper can show that Children's treated similarly situated white employees more favorably than her.  Specifically, Cooper can show that as a part-time TSS employee, she was not assigned enough hours to be promoted back to full-time status, while at the same time, Children's assigned enough hours to a white part-time TSS employee, Kara McGonigal, to be promoted to full-time employment.  Cooper can also show that when she achieved the 30-hour weekly average required over an eight-week period to be promoted to full-time, she was not promoted while the same white part-time TSS employee who achieved the same average over an eight-week period was promoted.  Accordingly, Cooper can establish a prima facie case for race discrimination claims under Title VII.

### 4. Children's has Put Forth Evidence that Permits a Jury to Find that Cooper Was Denied Promotion for Legitimate, Non-discriminatory Reasons

Once the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant to rebut the presumption of discrimination through the introduction of admissible evidence indicating that the challenged employment action was taken for legitimate, non-discriminatory reasons. *Burdine*, 450 U.S. at 254–55.  To sustain this burden, the defendant need not persuade the court that it was actually motivated by the proffered reasons because this inquiry does not involve a credibility assessment. *Id.* at 254; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).  The defendant satisfies its burden of production, and rebuts the

plaintiff's prima facie showing of discrimination, simply by introducing admissible evidence that, if taken as true, would permit a finding that the challenged employment action was taken for legitimate, non-discriminatory reasons. *St. Mary's Honor Ctr.*, 509 U.S. at 509.

The Court holds that Defendant has introduced evidence that can show that Cooper was denied promotion from part-time to full-time because she repeatedly failed to attain the 30-hour average required over an eight-week period. Children's asserts Cooper could not maintain the 30-hour weekly average required to be promoted to full-time because (i) her current client schedule conflicted with available client schedules, (ii) she never asked for work, and (iii) she turned down work assignments. Children's also asserts that even if Cooper achieved a 30-hour weekly average to be promoted to full-time, she attained that eight-week average off-cycle, meaning Cooper achieved her 30-hour weekly average at a time Children's would not have calculated the full-time status of its employees. Accordingly, Children's has satisfied its burden of production to show that its adverse employment actions were taken for non-discriminatory reasons.

### 5.   Cooper Can Show that Children's Reasons for Failure to Promote Are Pretextual

After the defendant meets its burden of production, the burden returns to the plaintiff to produce evidence from which a reasonable jury could find that the proffered reasons were pretextual. *Burdine*, 450 U.S. at 255–56. The plaintiff can show pretext by pointing to some evidence from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). The plaintiff can cast doubt on the employer's proffered reasons

by pointing to evidence that shows weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in those reasons. *Id.* at 765. The plaintiff can show that the discriminatory reason was a motivating cause of the adverse employment action through evidence which can show that: (1) the employer has previously discriminated against him; (2) the employer has discriminated against other persons within the plaintiff's protected class or within another protected class; or (3) the employer has treated similarly situated persons not within the protected class more favorably. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998).

The Court holds that a reasonable jury could disbelieve Children's reasons for failing to promote Cooper. Cooper asserts that she repeatedly asked Hills for client hours, never denied any client hours offered to her, and that her current client schedule did not conflict with available client hours as claimed by Children's. A jury could hear Cooper's version of why she was denied promotion to full-time and disbelieve Children's characterization of events. The facts Cooper asserts for why she was denied promotion to full-time status may evidence that the reasons Children's gives for denying promotion to Cooper were pretextual.

The Court also holds that a reasonable jury could believe that Cooper's race was more likely than not a motivating factor in Cooper being denied a promotion to full-time status. Cooper can show that Children's treated similarly situated persons not within her protected class more favorably, specifically Kara McGonigal. *See supra* Section III.J. Examining why Kara McGonigal, a white part-time TSS employee, was assigned enough hours to be promoted to full-time while Cooper was not assigned enough hours to be promoted to full-time, involves several disputes of material fact. Similarly, examining why Cooper was denied a promotion when she averaged 30 hours over an eight-week period but Kara McGonigal was promoted for attaining a 30-hour

average over an eight-week period also involves disputes of material fact.  Because Cooper is black and Kara McGonigal is white, a jury could find that the only difference between the two was their race and that race played a role in Defendant's decision not to promote Cooper.

Accordingly, Cooper can show that Children's discriminated against her because of her race.

### C.  Cooper has Abandoned her "Regarded As" Discrimination Claim by Children's

Counts three and four of Cooper's complaint seek damages from Children's for "regarded as" discrimination under the ADA and PHRA. (ECF No. at 12-15).  Children's moved for summary judgment on these claims, (ECF No. 78 at 14-16), arguing that Cooper could not establish (1) she had a disability, (2) she suffered an adverse employment action because of her alleged disability, and (3) that Children's legitimate, non-discriminatory reason for its actions were pretextual. (ECF No. 98 at 2).  Cooper failed to respond to Children's motion for summary judgment with respect to her "regarded as" disability claims.  (ECF No. 88).  Under Rule 56(e) of the Federal Rules of Civil Procedure, if a party "fails to properly address another party's assertions of fact," the court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3); *see Clarity Software, LLC v. Allianz Life Ins. Co. of North America*, 2006 WL 2346292, at *5 (W.D.Pa. August 11, 2006) (granting summary judgment for the defendant because the court found that the plaintiff had abandoned several of its claims by failing to respond to defendant's motion and brief).

It appears to the Court that Cooper has abandoned her "regarded as" disability discrimination claims under the ADA and PHRA.  The Court finds that summary judgment

should be granted because Cooper has failed to establish or demonstrate any genuine issue of material fact.  As such, the Court grants Children's motion for summary judgment with respect to Cooper's "regarded as" disability claims under the ADA and PHRA.

## VII. Conclusion

For the forgoing reasons, the Court will grant Defendant's motion for summary judgment regarding Plaintiff's claims of "regarded as" discrimination under the ADA and PHRA.

The Court will deny Defendant's motion for summary judgment regarding Plaintiff's race discrimination claims under Title VII and the PHRA.  Additionally, the Court will deny Defendant's motion to strike Plaintiff's sham affidavit.  An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHINNELLA COOPER,                    )        Case No. 3:18-cv-120
                                     )
                                     )        JUDGE KIM R. GIBSON
          Plaintiff,                 )
                                     )
     v.                              )
                                     )
CHILDREN'S BEHAVIORAL HEALTH,        )
INC.,                                )
                                     )
          Defendant.                 )
                                     )

## ORDER

NOW, this 30th day of September, 2021, upon consideration of Defendant's Motion for Summary Judgment (ECF No. 74) and Defendant's Motion to Strike Plaintiff's Sham Affidavit (ECF No. 99), and for the reasons set forth in the accompanying Memorandum Opinion, it is **HEREBY ORDERED** that Defendant's Motion for Summary Judgment (ECF No. 74) is **DENIED IN PART** and **GRANTED IN PART**.

It is **FURTHER ORDERED** that Defendant's Motion to Strike Plaintiff's Sham Affidavit (ECF No. 99) is **DENIED**.

BY THE COURT:

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**